# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68228-8-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELIZABETH ANN BEIMER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: June 10, 2013 |
| | ) | |

VERELLEN, J. — Elizabeth Beimer solicited an undercover police officer to kill the father of her child and his family. Viewed in the light most favorable to the State, the evidence established that she intended to facilitate and promote the killings when she agreed to pay the purported hit man $500 for his "expenses." We therefore reject Beimer's challenge to the sufficiency of the evidence and affirm her conviction for one count of solicitation to commit murder in the first degree.

## FACTS

Robert Davis and Elizabeth Beimer met in about 2000 and eventually began living together. Shortly after their daughter T.B. was born in 2002, the couple separated. In 2003, Davis moved to California and had no contact with T.B. for two years.

Davis moved back to Washington in 2005 with his wife Ruby. He attempted to resume his relationship with T.B. and eventually instituted parenting plan proceedings. Davis's efforts upset Beimer, and in 2007, she accused him of molesting T.B. The police investigated the allegations, but no charges were filed.

In August 2008, Beimer's friend Richard Howell travelled from Arizona to Washington to help her move. Beimer hoped to avoid the Washington court proceeding by moving to Idaho. When Davis obtained a restraining order preventing Beimer from taking T.B. out of the state, Howell stayed on and began living with Beimer. Howell would accompany Beimer when she brought T.B. to Davis for residential time.

A few weeks after Howell arrived, Beimer told him that she wanted Davis "taken care of," meaning that "[s]he wanted him dead."[1] Beimer was afraid that Davis might gain custody of T.B. in the ongoing court proceeding. She became enraged when Davis discovered where T.B. was attending school and had access to her in the classroom. Beimer told Howell that "the whole family had to be taken care of,"[2] including Davis's wife and his parents. She became insistent that Howell help her find someone to do the job before an upcoming court date or she would do it herself. Beimer hoped that the killing could occur during T.B.'s residential time with Davis because the whole family would be at the same location. When Howell questioned whether this might traumatize T.B., Beimer replied, "she'll get over it."[3]

---

[1] Report of Proceedings (RP) (Sept. 27, 2011) at 759.

[2] Id. at 768.

[3] Id. at 772.

2

In response to Beimer's continuing requests, Howell finally agreed to make some telephone calls. In order to placate Beimer, Howell told her that he had found someone, but that the job would cost $10,000. Beimer said that she could not pay that much. Howell contacted a friend of his in California, who unsuccessfully attempted to persuade Beimer to use the court system to resolve the problems. Beimer indicated that she would attempt to carry out the plan herself.

At around this time, Howell reconciled with his wife, who moved to Seattle to join him. On October 20, 2008, Howell contacted the Davises and told them about Beimer's efforts. Howell and the Davises then reported the plan to the Auburn Police Department.

The following day, Howell met with Detective Randey Clark. After making a statement, Howell agreed to call Beimer on a speakerphone in Clark's presence. Howell told Beimer that he had identified a potential "prospect," a biker term for someone who is connected to a biker gang but who does not yet have his "colors" or full membership.[4] Beimer expressed concern that the plan might backfire, but told Howell to contact the prospect. Howell then made two recorded calls to Beimer and told her that the prospect was on his way from Spokane to meet with her.

Clark arranged for Deputy Mark Hayden of the King County Sheriff's Office to participate in an undercover operation as the potential hit man. Hayden adopted the persona of a prospect for the Hell's Angels who was trying to establish his credibility and obtain full membership.

---

[4] RP (Sept. 21, 2011) at 252.

3

Hayden placed two recorded calls to Beimer and arranged to meet her at an Auburn motel. During the calls, Beimer offered to provide pictures of the "child molesters," and drawings of the trailer where Davis and his wife lived and of the house where Davis's parents lived. She also offered to drive Hayden along the route to the location so that he would be able to find it.

Auburn police set up surveillance cameras and microphones in the motel room where Hayden was staying and video recorded Beimer's visit on October 24, 2008. Upon arrival, Beimer confirmed that she remained committed to the plan. She showed Hayden photos of the intended victims and described where Davis's parents slept in the house. She also provided a physical description of Davis and details about his schedule. Beimer recommended that Hayden kill Davis and his wife quickly while they were sleeping, because "she'll have a mouth on her."[5]

Beimer expressed a preference that the murders occur that same evening. She explained that she would then "carry on like usual" by bringing T.B. on the following day for her regularly scheduled weekly residential time with Davis.[6] When Davis failed to appear, she planned to leave a voicemail message on his telephone to the effect of "[W]here are you, I'm waiting for you to come get our daughter. It's your visitation."[7] Beimer reasoned that nobody would suspect her because "let's put it this way[,] [t]his is Beth goody two shoes who does nothing wrong usually."[8]

---

[5] Ex. 30 at 18.

[6] Id. at 9.

[7] Id.

[8] Id. at 10.

During the course of the conversation, Hayden asked Beimer if she had $500 to help him out with his travel and motel expenses. Beimer responded that she could "try to come up with that."[9] Hayden later reminded Beimer that he needed "cash only," and she responded, "Okay."[10] Finally, Hayden explained that he would probably disappear for a few days and that if Beimer could then give him the $500, "that'd be cool."[11] Beimer again responded, "Okay."[12] Hayden commented that "quite honestly it should be more," but acknowledged that "the money's tight."[13]

Near the end of the meeting, Beimer offered Hayden a "thick rebar" that she had in her van.[14] When Hayden offered to "to make it personal" by using the rebar, Beimer replied, "Go for it."[15] Hayden accompanied Beimer to her van, where she handed him the rebar. Police arrested Beimer a short time later.

The State charged Beimer with one count of solicitation to commit murder in the first degree. The jury found her guilty as charged, and the court imposed a standard range 180-month sentence.

## DISCUSSION

Beimer contends that the evidence was insufficient to support her conviction. She argues that because her negotiations with Hayden about the murders were

---

[9] Id. at 12.

[10] Id.

[11] Id. at 17.

[12] Id.

[13] Id.

[14] Id. at 19.

[15] Id.

completed before any discussion of a payment occurred, her reluctant agreement to pay $500 involved only Hayden's request for the reimbursement of his "expenses." She claims that there was therefore no nexus between the payment and the killings and that the State failed to prove she offered money to facilitate or promote the crime. We disagree.

A person is guilty of criminal solicitation when "with intent to promote or facilitate the commission of a crime, he or she offers to give or gives money or other thing of value to another to engage in specific conduct which would constitute such crime."[16] Murder in the first degree requires "a premeditated intent to cause the death of another person."[17]

Here, Beimer told Howell that the Davis family had to be "taken care of" and pestered him until he agreed to set her up with a hit man. Beimer then met with the purported hit man believing that he was willing to kill the Davises in order to gain his "colors" with a motorcycle gang. Beimer provided Hayden with photographs of the intended victims, a diagram of the house, and detailed information about the neighborhood, the Davises' schedules, their physical characteristics, and their locations in the trailer and the house. At the conclusion of the meeting, Beimer supplied Hayden with a potential murder weapon and encouraged him to "go for it."

Viewed in context, Beimer's agreement to pay $500 was inextricably linked with her extensive efforts to assist Hayden in the carrying out of the crime. The evidence

---

[16] RCW 9A.28.030; see State v. Jensen, 164 Wn.2d 943, 952, 195 P.3d 512 (2008) ("Solicitation involves no more than asking someone to commit a crime in exchange for something of value.").

[17] RCW 9A.32.030.

was clearly sufficient to permit a rational jury to find beyond a reasonable doubt that Beimer agreed to pay Hayden's "expenses" with the intent to facilitate and promote the crime.[18]

Affirmed.

WE CONCUR:

_Spearma, A.C.J._

_Cox, J._

_Verellen, J._

---

[18] See State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).